PLYMOUTH COUNTY, Appellant, v. H. R. SCHULZ et al., Appellees.

No. 39698.

NOVEMBER 21, 1929.

*Herbert S. Martin, George W. Sturges,* and *Snyder, Gleysteen, Purdy & Harper,* for appellant.

*Roseberry & Roseberry, J. T. Keenan,* and *Nelson Miller,* for appellees.

EVANS, J.—I. The Plymouth County Savings Bank was organized at Le Mars in August, 1921. In September following, it obtained a designation as a depositary, and gave a bond as such for $50,000, known as Exhibit A in this record. The obligee in the bond was the county treasurer, Langhout. His then term of office expired on December 31, 1922. Pursuant to his re-

election, he continued in office. In January, 1923, a new bond was delivered to the treasurer, purporting to be for $80,000. The signers of the two bonds were identical. To this bond the defendants pleaded fraudulent alteration, in that the penalty was increased from $50,000 to $80,000. We give our first attention to this defense.

The principal on the bond was the Plymouth County Savings Bank. The four sureties thereon were V. J. Martin and these three defendants. V. J. Martin was the president of the bank, and its principal promoter. Defendants Clasen and Rentschler, were directors of the bank. The defendant Schulz was a patron of the bank, who had been somewhat active in promoting its interests, and who had solicited the county treasurer to make said bank a depositary. Pursuant to receipt of the bond, the county treasurer continued to make deposits in said bank until it closed its doors, in January, 1925, the same treasurer being still in office, pursuant to re-election. Our first consideration will be devoted to the question of alteration of the second bond. The burden of this issue is upon the defendants. The defendants admit their signatures. Each of them testified, however, that the bond, when signed by them, carried a penalty of $50,000, and no more. Both bonds are in evidence, and are known as Exhibits A and B, respectively. The charge of alteration is directed against Exhibit B only. The penalty of this bond was $80,000. The problem presented to us in this part of the record is to appraise the direct evidence of the defendants, in the light of all the circumstances appearing in the record, and to determine therefrom whether they have proved the alleged alteration. It is not claimed that the county treasurer or any public official knew of the alleged alteration. The theory advanced in argument by the defendants is that Martin was responsible for the alteration. The nature of the evidence of the defendants is such that it may not be readily controverted by direct evidence,—no other witnesses being present when the defendants signed the paper. In such a case, the court is called upon to scrutinize the evidence carefully, and to put it to the test of consistency with the circumstances of the transaction and with the subsequent conduct of the defendants themselves. The only direct evidence adduced by the plaintiff was that of County Treasurer Langhout and that of Martin.

Martin was criminally responsible for the failure of the bank. He was indicted for a felony, and pleaded guilty. Langhout testified that, under the first bond, the deposits, during tax-paying time, had, on two or three dates, exceeded the permissible amount of $25,000; that for that reason he informed Martin that the bond should be increased to $80,000. There were more than 20 depository banks in the county. It was customary for the treasurer, at the beginning of each term, to send to each bank à blank form of bond, only partially filled by himself. He sent such a bond to the Plymouth Savings Bank, with the blanks filled only to the extent of inserting his own name in the proper places, and inserting the penalty of the bond. He testified that Exhibit B was the bond which he had sent to the Peoples Savings Bank, and that the amount of the penalty had been inserted by him as $80,000. Martin in his deposition fully corroborated this testimony. His credibility, however, is seriously impeached by his conviction of a felony, and it is, therefore, entitled only to a qualified consideration. With this conflict of direct testimony, we turn to collateral events.

It appears that the claim of alteration was never put forth by any of these defendants until April 6, 1926; that, up to that time, the attitude of each one had been that of assumed and recognized liability on the bond. The explanation offered by the defendants of this circumstance is that they had not known, be-fore said date (or a short time prior thereto), that the bond pur-ported to be for $80,000. It further appears that, shortly after the failure of the bank, on January 7, 1925, these defendants made formal written demand upon public officials to present a claim for preference in the receivership proceeding. Plymouth County proceeded to comply with that demand, and filed an in-tervention in the receivership, praying for preference. The defendants (not including Schulz, in the first instance) inter-vened, with a verified petition of their own, alleging that they were interested in the proceeding, as sureties on the bond. As a part of their petition, they set forth a copy of Exhibit B. A hearing in court was had upon this intervention. All these de-fendants were present, and Schulz personally appeared, and re-quested to be joined with his present codefendants in the inter-vention, and his request was granted. The only explanation of this circumstance offered by each defendant is that he did not

read the bond, and did not read his petition. It also appears that the same attorney was representing both the county and these defendants in that proceeding, and it is intimated in argument that the defendants were deceived. It further appears that, on August 21, 1925, the defendant Schulz filed another petition of intervention. At that time he was represented by his present counsel. That petition contained the following allegation:

"That, on or about January 12th, 1923, the said bank executed to Plymouth County, Iowa, and to A. Langhout, as treasurer of said county, a bond in the sum of $80,000, to secure the safety of any moneys then or thereafter deposited by said county treasurer in said bank. And this intervener, together with H. F. Clasen, George Rentschler, and V. J. Martin, executed the said bond as sureties."

Again the explanation is that he did not read either the petition or the bond. The following cross-examination of Schulz appears:

"After I discovered that it was an $80,000 bond, as quick as I found it out, I told my attorney I never signed any $80,000 bond. I told the supervisors, at the meeting in April, 1926, when Mr. Clasen and Mr. Rentschler and Attorney Martin and the auditor, Frank Stamp, and various supervisors were present. That was the first time that I made any denial to any county official of my liability on this $80,000 bond. Q. And you had known it was an $80,000 bond as early as August, 1925, had you not? A. Well, I wouldn't like to say that. I don't know whether Mr. Miller told me that at that time or later on. Mr. Miller prepared this petition, and I signed it, and he told me what was in it; but I didn't read it over."

On redirect, he testified on the same subject as follows:

"Q. You were asked about the first time you knew the bond was $80,000, instead of $50,000. When did you say, now, was the first time that came to your attention? A. It seems to me that it came to my attention when this case was tried, in February. I don't think, Mr. Miller, you told me about putting the $80,000 in there, but you called my attention to it, and I went up and investigated the bond."

The county auditor testified that both defendant Schulz and Rentschler called at his office, a few days after the closing of the bank, and examined the bond. It is a significant circumstance that, in all the conferences of these defendants together, they had never discussed the alleged alteration. Schulz testified that he had discovered the alteration a month or six weeks prior to April 6th. Rentschler testified:

"At this meeting [April 6, 1926] Mr. H. S. Martin stated that there were rumors around that this bond had been raised from 50 to 80 thousand, and he said the county wanted to know where it was at, and that, after the decision on this preference had been decided, they wanted to know that these sureties were willing to pay. I had heard of *these rumors* referred to by Attorney Martin before the meeting. I heard of them six weeks or possibly two months before, *from Mr. H. R. Schulz.* Up until the time of this meeting, I had never seen the bond Exhibit B since the time I signed it. At this meeting, Mr. Clasen asked if he might see the bond, and it was produced. We all looked at it."

Clasen testified that he never knew until April 6, 1926, that the bond was for $80,000. On the question of his knowledge of the actual penalty in the bond when he signed it, each defendant testified as follows: Schulz testified:

"Q. Did you read that bond over before you signed it? A. I read over the amount of the penalty. Q. You just read over the amount of the penalty, is that right? A. Yes, sir. Q. Didn't you read the rest of the bond? A. I did not. I had signed bonds for the bank before. Q. Then you signed this bond without reading it, except that you noticed the penalty in it? A. The typewriting was put in. I read that. Q. Did you not read the printed portion of the bond? A. I did not. At the time I signed this bond, I noticed the penalty which appeared in it. I am absolutely sure that it was only $50,000, and remember distinctly having read that at the time I signed it."

Rentschler testified:

"Q. Why are you so sure that the penal sum of that bond at that time was only $50,000? A. Why, I naturally would

know what I signed for. Q. Was anything said or done there that fixed it particularly in your mind at that time? A. Oh, I am sure it was a $50,000 bond. Q. Well, why are you sure? A. Well, I am certain that I read the bond, and that it was $50,000. Q. You have a distinct remembrance, do you, that, when you signed it, that it was $50,000? A. Yes, sir. The events which have taken place since then are not what make me think it was $50,000 when I signed it; I always knew it was a $50,000 bond. Q. You say you read it when you signed it? A. I read the amount. Q. Just the amount? A. I don't think I read the bond, to know of its contents,—I couldn't say that I did.''

Clasen testified:

"That is what I paid attention to, is the figures, '80,000,' and I certainly am sure that, at the time I signed this bond, I looked to be sure whether it was 80 thousand or 50 thousand. I am absolutely sure that, at the time I put my name on this bond, I looked to see whether it was 80 thousand or 50 thousand. Where the 80 thousand is now in figures, it was 50 thousand; but as to the 80 thousand in letters, I cannot state whether that was 80 thousand or 50 thousand at the time I signed it.''

Clasen verified the first petition of intervention, filed April 30, 1925. This set forth a copy of Exhibit B. It appears from the record that the bond shows on its face that there had been an erasure in the blank space where the penalty of $80,000 was written. This appears to have been the basis of the "rumor" concerning which the witness Rentschler testified.

It appears also that, upon the trial of petition of intervention, the following written stipulation was introduced in evidence:

"12. That for the purpose of securing to the said treasurer and the said county the repayment of the funds so deposited in said bank, the interveners George Rentschler, H. F. Clasen, and H. R. Schulz, as sureties, executed a bond, with the said Plymouth County Savings Bank as principal; that said bond is dated January 12th, 1923, and was finally executed and delivered not later than January 27th, 1923; that the same was duly filed

in the office of the auditor of said county on the 27th day of January, 1923; and that the same was duly accepted and approved by the said treasurer and by the said county by its board of supervisors on March 6th, 1923; that Exhibit A attached to the petition of intervention filed herein by said sureties is a full, true, and correct copy of said bond and of all indorsements thereon.

"13. That said bond is still in the possession of the said county and its said treasurer, and is still in full force and effect." (Exhibit A referred to in the above stipulation is a copy of the bond Exhibit B herein.)

To the foregoing was added the following oral stipulation entered of record in open court:

"By Mr. Keenan: It is further stipulated that Exhibit 1 is a true copy of the bond given by the Plymouth County Savings Bank to A. Langhout, treasurer of Plymouth County, Iowa, except the recording marks of the county recorder on the back thereof, which constitutes no part of the original bond." (Exhibit 1 was another copy of Exhibit B.)

The record discloses also another circumstance which is entitled to some consideration. Each surety made an affidavit of financial qualification. These affidavits were made upon blank forms attached to the bond. Each surety wrote out his own qualifying affidavit and signed the same. Precisely the same thing was done at the time of signing the bond Exhibit A. In connection with the signing of the bond Exhibit A, the defendant Rentschler qualified for $50,000, and the other three sureties qualified for $30,000 each. At the time of signing the bond Exhibit B, the three sureties other than Schulz adopted the same figures as they had adopted in signing Exhibit A. Schulz raised his qualification figures from $30,000 to $50,000. The sum total of financial qualification was thereby made to reach the sum of $160,000. This circumstance is suggestive only. The weight of it is dependent upon the other circumstances of the case. If the sum total of qualification had been deficient for the purpose of a bond of $80,000, the circumstance would have been very significant in favor of the defendants. The fact that the sum total of qualification was raised to $160,000 deprives the de-

fendants of one circumstance that would have corroborated their testimony. Taking the circumstance as it is, it does corroborate the testimony of the county treasurer, Langhout, that he advised the bank that an $80,000 bond would be required. No explanation is offered of the circumstance, other than that Schulz testified that he inserted the amount in his qualifying affidavit without knowing what amount of qualification he had inserted in his affidavit to the bond Exhibit A. As against the foregoing circumstance, the defendants place much reliance upon a letter written by the county auditor apparently to the Plymouth County Savings Bank, under date of January 23d, as follows:

"Le Mars, Iowa, January 23rd, 1923.
"Plymouth County Savings Bank
"Le Mars, Iowa.
"Dear Sirs:

"Inclosed find bond for County Deposits, the Board request that your Bond be increased from $50,000.00 to $80,000.00 so as to comply with the State Laws on County Deposits.

"Respectfully yours,
"F. W. Stamp,
"County Auditor."

Inclosed with the letter was a blank form of bond for county deposits. None of the blanks in this form were filled to any extent. The same appears to have been pinned to the letter when it was offered in evidence herein. The purported date of Exhibit B is January 13th. The affidavits of qualification appear to have been made on January 16th. The bond Exhibit B was received by the treasurer sometime prior to January 27th, on which latter date he filed the same with the county auditor. The defendants advance the theory that, at the time of the writing of this letter by the auditor, the bond Exhibit B, with a penalty of $50,000, was already in his hands, and that the board of supervisors rejected the same, and that the auditor returned the same in this letter to the bank; that thereupon Martin raised the penalty in that same bond, and returned it to the treasurer. The defendants necessarily rely upon this letter as proof of that fact. The defendants construe the words "inclosed find bond," as contained in said letter, to refer to Exhibit B. There is no other evidence of that fact, except the terms of the

letter itself. The plaintiff construes these words as referring to the blank bond pinned to the letter. The bond Exhibit B could come to the auditor's office only through the treasurer. The treasurer testified that no bond was returned to him except Exhibit B in its present form, and that, shortly after receiving the same, he filed it with the county auditor on January 27th. The county auditor testified that no bond had come to his hands from the Savings Bank except Exhibit B, in its present form. It does appear that, on January 19th, the board of supervisors approved the depository bonds of seven of the banks in the county. This circumstance is relied on by the defendants as evidence that they had rejected the bond of the Plymouth County Savings Bank. But there were more than 20 banks in the county that were depositories. So far as disclosed by the record, only seven of them were considered on January 19th. We see no reason for saying that the contents of the auditor's letter can be deemed proof of the theory thus advanced by the defendants.

The foregoing gives us the more important features of the evidence as bearing on the question of alteration. Is the positive evidence of the defendants to be accepted categorically by virtue  of its numerical strength? The credibility of this testimony is seriously impaired by the mental attitude of the defendants as indicated by their conduct for a period of more than one year. The force of the recitals in their pleadings in court in the intervention proceeding is great. Concededly (in argument), if these recitals had been made knowingly, it would be fatal to their present contention. May such recitals be wholly brushed away by the explanation that they were not known to, or read by, the parties? Some of the defendants testified that it was not unusual for them to sign papers without reading or understanding them. What reason is there in the record for believing that they read the bond more carefully, when they signed it, than they read their pleadings when they verified them? These parties brought the bond Exhibit B into court by literal copies, at least three times. Each copy was presented under oath. May a litigant exhibit a document to the court under oath and yet say that he had not seen it himself? We think the testimony of these defendants to the effect that they had not discovered the penalty of Exhibit B until about April 6, 1926, cannot be credit-

ed. On that point, the evidence quite overwhelms them. This disposes of the only explanation offered by them for the mental attitude of acquiescence and ratification towards Exhibit B throughout all the period of the earlier litigation. We think the recitals of their pleadings must be taken as true against them. These recitals, coupled with their conduct, are contradictory to their direct testimony. They also tend to support strongly the plea of ratification. We have given a most careful reading to the record, and we think it must be said that the defendants have not carried the burden of proving their allegations of alteration. Our conclusion at this point renders it quite unnecessary that we should consider the alleged alternative liability of these defendants upon the first bond, Exhibit A.

II. A further defense was interposed as against Exhibit B. It was averred that the Plymouth County Savings Bank was never designated as a depository in the manner required by law;  that the board of supervisors never fixed any limit as to the amount of deposit, as required by law; that the county treasurer failed to approve said bond, as required by law. On these grounds, the defendants aver that they are in no manner liable on the bond; that no legal deposits were ever made pursuant thereto; and that all deposits that were made were so made illegally, for the reasons stated. By way of reply, the plaintiff pleaded an estoppel and ratification, and predicated the same in part upon the court procedure which we have considered in the first division hereof, and in part upon the oral promises of the defendants which were made as an inducement to the plaintiff to forbear action against the sureties until final action could be had in the preference case, and until the dividends to be realized from the receivership should be applied on the indebtedness. The alleged promises were that, if the claimed preference were disallowed, and if the plaintiff would forbear action until all dividends of the receivership were applied, then the defendants would pay the balance without controversy of any kind with the plaintiff.

As heretofore stated, the defendants did present a written request or demand to the proper officials of Plymouth County that the county should prosecute a claim for preference before the receiver. The defendants predicated their right to make such

demand upon their liability as sureties under Exhibit B. Plymouth County instituted the proceeding, as requested. The defendants joined in that proceeding, as heretofore stated. The verified petition of Clasen and Rentschler (afterwards joined in by Schulz) contained Paragraphs 9 and 10, as follows:

"9. That, in order to secure the deposits so made by said treasurer in said Plymouth County Savings Bank, these interveners, as sureties, executed a depository bond with said Plymouth County Savings Bank, as principal, which bond is dated January 12, 1923, and was finally executed and delivered not later than January 27, 1923, a copy of which is hereto attached, marked Exhibit A, and made a part hereof.

"10. That said bond was duly *approved and accepted by said county treasurer and by said Plymouth County by its board of supervisors, and by reason thereof and their suretyship thereon, these* interveners obligated themselves to hold said treasurer and said county harmless by reason of said deposits, and to well and truly repay all money then or thereafter deposited in said bank by said treasurer, including the amount on deposit in said bank on the date of the appointment of the receiver herein and the interest thereon as provided by law."

That proceeding was prosecuted to a final hearing. These defendants stood therein at all times upon the allegations of the regularity of the bond and of their liability thereon. If they had alleged there what they contend for here, they could have had no standing whatever in that case. Having committed themselves to those allegations in order to maintain their standing in that case and to induce the plaintiff herein to prosecute such action in their behalf, they may not now controvert such allegation to their own benefit and to the detriment of Plymouth County. The defendants themselves in their written demand selected the ground upon which preference should be claimed. This ground was that the deposits in question were "public money," and as such entitled to a preference. If the present contention of the defendants had been presented in that hearing, and had been sustained, it would have resulted in a preference. But that ground of preference was rendered unavailable to Plymouth County by the attitude of the defendants themselves, as herein

set forth. If preference had been established then upon that ground, Plymouth County would have been protected thereby to that extent. The receivership is now closed, and its assets have been distributed. If the defendants should now be permitted to contradict their assertions in the former litigation, and if their present contentions should be sustained in this proceeding, then Plymouth County would be left without any remedy whatever. It further appears without dispute that these defendants did request delay and forbearance in enforcing collection of the bond from them, and that they did orally offer and agree to pay without controversy whatever balance might be due the county after the application of dividends from the receivership. It is claimed by the defendants, however, that, at the time they made those promises, they had not discovered the irregularities pleaded by them as affecting the bond. Such alleged irregularities are all predicated upon matters of record. They were as readily discoverable before, and when, the promises were made as they were at any time thereafter. The defendants themselves testified, in substance, that they had made these promises, and that they had intended to pay such balance, and that such intentions ceased April 6, 1926, when, as they claim, they discovered the alteration in the bond. If their promises were ever effective as an estoppel against setting up this latter defense of irregularity, such estoppel could not be lifted by the subsequent discovery of another alleged defense.

It may be noted here that the bond itself contains a paragraph whereby the sureties expressly waive irregularities of the kind here pleaded. This paragraph of the bond was challenged as surplusage, in that it was no part of the requisite of a statutory bond. Without passing on the question thus raised by defendants, we shall ignore such provision in the bond itself, and build nothing upon it.

We deem it beyond fair doubt that the defendants are estopped, as against this plaintiff, by their pleadings and attitude in the former litigation, wherein this plaintiff was a party at their own solicitation, and that they may not now change from it to the detriment of the plaintiff. If the alleged defense be legally good, it was good from the beginning. If good, the defendants had no standing to make their demand upon the plaintiff. Having induced the plaintiff to undertake litigation

and to incur expense therein upon grounds selected by the defendants themselves, they must stand committed to their selected ground to the end of the controversy.

It appears that, at the time of the closing of the bank, the county deposit was somewhat in excess of $21,000. This amount has been reduced by dividends to the sum of $9,888.78. The defendants have had the full benefit of all dividends, and have had the full benefit of the prior litigation, where a preference was sought. This suit was brought to recover the above balance. We hold that the defendants are estopped to set up the defense herein considered .

The decree below is, accordingly,—*Reversed.*

ALBERT, C. J., and FAVILLE, DE GRAFF, and GRIMM, JJ, concur.